## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| ADVANTAGE PAYROLL SERVICES, INC. and PAYCHEX INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Docket No. 2:21-cv-00020-NT ) |
| RONALD RODE and PAYROLL SERVICES, INC., | ) ) ) |
| Defendants. | ) |

**ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before me is the Plaintiffs' Motion for Partial Summary Judgment (ECF No. 46) brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Plaintiffs seek summary judgment on Count I of the Complaint, their breach of contract claim against Defendant Ronald Rode. For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### FACTUAL BACKGROUND[1]

In 1998, Ronald Rode bought a payroll services franchise from Advantage Payroll Services, Inc. ("**Advantage**") and operated it as Payroll Services, Inc. ("**PSI**") in Louisiana. Pls.' Reply Statement of Material Facts ("**SMF**") ¶¶ 1–2 (ECF No. 54).

---

[1] The facts are drawn from the Plaintiffs' Reply Statement of Material Facts ("**SMF**") (ECF No. 54), which contains the Plaintiffs' Statement of Material Facts (ECF No. 46-2), the Defendant's Statement of Material Facts (ECF No. 48-1), and the parties' responses to each other's facts. In addition, I consider the Settlement Agreement and Agreement for Purchase, Sale and Transfer of Advantage Licensed Businesses ("**Settlement Agreement**") and incorporated Non-Solicitation and Non-Servicing Agreement ("**NS Agreement**") (ECF No. 43-3) and other documents in the record.

In August of 2016, Mr. Rode and other Advantage licensees sued Advantage and Paychex, Inc. ("**Paychex**")[2] over a licensing dispute. SMF ¶ 4. Mr. Rode, both in his individual capacity and on behalf of PSI as its sole managing member, negotiated an agreement with Advantage/Paychex to settle that case. SMF ¶¶ 5–6; *see* Settlement Agreement and Agreement for Purchase, Sale and Transfer of Advantage Licensed Businesses ("**Settlement Agreement**") (ECF No. 43-3). Pursuant to the Settlement Agreement, Advantage/Paychex purchased all rights and interest in all of the PSI accounts and clients (the "**Assigned Clients**") for $4,602,347.89. SMF ¶ 12; *see* Settlement Agreement ¶ 1, Ex. A. Under the Settlement Agreement, Advantage/Paychex were also given the option of hiring former PSI employees. Settlement Agreement ¶ 4(b).

## I.     The Non-Solicitation and Non-Servicing Agreement

Incorporated in the Settlement Agreement as Exhibit D is a Non-Solicitation and Non-Servicing Agreement (the "**NS Agreement**"), which contains three limitations on Mr. Rode and PSI. SMF ¶ 9. These covenants form the basis of the Plaintiffs' breach of contract claim against Mr. Rode that is at issue in their Motion for Partial Summary Judgment. In the first of these provisions, Mr. Rode agrees "not to take any action or make any statement, directly or indirectly, that could deter, hinder, or divert the ongoing business or patronage of Advantage or Paychex and the

---

[2]     At some time after 1998, Paychex, Inc. ("**Paychex**") purchased Advantage Payroll Services, Inc. ("**Advantage**"). Advantage is now a wholly owned subsidiary of Paychex. SMF ¶ 3. I sometimes refer to them as Advantage/Paychex.

Assigned Clients." NS Agreement ¶ 6[3] (the "**don't deter, hinder, or divert**" clause). In the second provision at issue, Mr. Rode promises "not to: (i) provide any of the services offered by Advantage or Paychex to any Assigned Clients; or (ii) contact any Assigned Clients for any reason related to the services offered by Advantage or Paychex to any Assigned Clients." NS Agreement ¶ 6 (the "**no-service, no-solicit**" clause). Finally, in the third provision, Mr. Rode agrees:

> not to solicit or in any way induce any employee . . . to disassociate with Advantage or Paychex, to leave his or her employment with Advantage or Paychex, . . . or to devote less than all of his or her efforts to the affairs of Advantage or Paychex for any purpose which would directly or indirectly interfere or conflict with such person's employment . . . with Advantage or Paychex.

NS Agreement ¶ 5 (the "**no-poaching**" clause). All three of these provisions were to remain in effect for four years. NS Agreement ¶¶ 5–6. Mr. Rode signed the Settlement Agreement and incorporated NS Agreement on March 12, 2018. SMF ¶ 6.

The NS Agreement also contains provisions that address the consequences of a breach of the agreement. For one, the parties agree that any breach "would cause irreparable harm and damage to Advantage and/or Paychex in an amount that would be difficult to quantify, measure or ascertain," thereby entitling Advantage/Paychex "to relief through restraining order, injunction, and all other available remedies, including claims for monetary damages incurred because of such breach." NS

---

[3] This provision goes on to state that Mr. Rode cannot "solicit or in any way induce, directly or indirectly, any Assigned Clients to terminate their business relationship with Advantage or Paychex . . . ." NS Agreement ¶ 6. The Plaintiffs' argument in this motion for summary judgment does not address this clause, instead focusing on the "don't deter, hinder, or divert" clause.

3

Agreement ¶ 7. The NS Agreement also contains a liquidated damages clause providing that, in the event of a breach, Mr. Rode:

> will be liable for the breach in the form of liquidated damages in the amount of five times the [Twelve Trailing Months] revenue that was used to calculate the Asset Purchase Price Advantage paid for any Assigned Client that ceases its patronage of Advantage and/or Paychex as a result of [Mr. Rode's] breach . . . without any need to establish actual damage or harm.

NS Agreement ¶ 7. Advantage/Paychex would further be entitled to reasonable attorneys' fees and costs. NS Agreement ¶ 7.

## II.  The Formation of PayrollHR Solutions, Inc.

At the center of this dispute is Mr. Rode's involvement with one of Advantage/Paychex's competitors, PayrollHR Solutions, Inc. ("**PayrollHR**"), and three of PayrollHR's employees—Beau Thurman, Caleb Nations, and Ashley Hargroder.[4] All three were employees of PSI in March of 2018 when Mr. Rode entered into the Settlement Agreement and NS Agreement. SMF ¶ 17.

In May of 2018, Advantage/Paychex took over PSI and offered Mr. Nations and Ms. Hargroder employment as Senior Payroll Specialists. Offer Letter to Nations (ECF No. 43-6); Offer Letter to Hargroder (ECF No. 43-9). Mr. Nations and Ms. Hargroder each accepted Advantage/Paychex's employment offer and signed a Confidentiality and Non-Solicitation Agreement ("**CNS Agreement**") in which they agreed not to disclose information concerning Advantage/Paychex's customers, clients, or accounts. CNS Agreement (ECF No. 43-7 and 43-10). Mr. Rode was aware

---

[4]   Beau Thurman and Caleb Nations are partners in PayrollHR. SMF ¶ 23.

4

that Mr. Nations and Ms. Hargroder had accepted employment with Advantage/Paychex and had entered CNS Agreements with Advantage/Paychex because he signed the CNS Agreements on behalf of PSI. SMF ¶¶ 18–19.

Mr. Thurman did not accept employment with Advantage/Paychex. SMF ¶ 20. Mr. Thurman did, however, begin discussing the creation of a new payroll services company, PayrollHR, with Mr. Rode. SMF ¶ 24. Mr. Rode, through yet another entity he controlled, Employer Services, Inc., agreed to provide seed money for PayrollHR. SMF ¶ 24. Mr. Rode facilitated the transfer of $130,000[5] to PayrollHR, with $100,000 of the funds being transferred after the Settlement Agreement and NS Agreement were signed. SMF ¶ 24. The transfers continued until March 2019. SMF ¶ 25. Mr. Rode also provided PayrollHR with computers and office furniture from PSI and free office space that PSI was not using at the time. SMF ¶ 26; Rode Dep. Vol. I 91:9–92:22; 114:14–115:24 (ECF No. 43-1).

Defendant Rode also supported PayrollHR with professional services and advice, such as helping to set up PayrollHR's books, recommending legal counsel, helping with bookkeeping and staffing, traveling on behalf of PayrollHR as a consultant to review payroll software, and giving general business advice. SMF ¶ 26. Email communications from the spring and summer of 2018 reveal Mr. Rode's involvement with third-party vendors, customer and provider agreements, logos,

---

[5] The parties dispute whether the funds should be characterized as an investment or a loan. Advantage/Paychex characterizes the payments as an investment. SMF ¶ 66. Mr. Rode characterizes the payments as loans, which he claimed were made at 5% interest. Rode Dep. Vol. I 73:8–76:25 (ECF No. 43-1). But Mr. Rode admitted that he never sought or received repayment for the money transferred to PayrollHR. Rode Dep. 76:1–20.

5

signs, branding, insurance, social media, payroll, income, and the budget. *See* SMF ¶¶ 28–40, 50–53. Mr. Thurman hired Mr. Rode to teach Mr. Nations how to do a general ledger at some point around this time as well. Thurman Dep. Vol. II 456:21–23 (ECF No. 43-12).[6]

During the time Mr. Rode was providing this assistance, Mr. Thurman was soliciting Assigned Clients to start doing business with PayrollHR. *See* June 20, 2018 Email (ECF No. 42-12); July 12, 2018 Email (ECF No. 43-25); SMF ¶ 40. According to Mr. Thurman, Mr. Nations and Ms. Hargroder, who were still working for Advantage/Paychex at this time, downloaded and forwarded him confidential information about Advantage/Paychex customers such as "a spreadsheet of the current and dead Advantage clients." SMF ¶¶ 40–41; *see also* Nations' Emails (ECF Nos. 42-4, 42-5, 42-6, 42-7, 42-8, 42-9). Mr. Thurman also instructed Mr. Nations and Ms. Hargroder to send him the online log-in information for Advantage/Paycheck customer accounts to help convert them to PayrollHR customers. *See* July 8, 2018 Email (ECF No. 43-29).

On July 12, 2018, Mr. Thurman said in an email to Mr. Nations and Ms. Hargroder:

> Just a heads up, I will be pushing out 144 emails tomorrow, some of these are clients that are small. I am including the original email in it, so if you get a call it should go like "Yeah, I hear he's got a new company" and end it there and maybe call them on a one off privately or let me know if they inquire.

---

[6] There is some dispute about the timing of Mr. Rode's training of Mr. Nations. It is clear from the emails, however, that Mr. Thurman was consulting both Mr. Rode and Mr. Nations about payroll questions in July of 2018. *See* July 6, 2018 Email 2 (ECF No. 43-23) (Mr. Thurman asking Defendant Rode and Mr. Nations, "Fellas, was I to be paid this week, still on the bi-weekly basis?").

> Ron is nervous…he doesn't need to be. I'm not going to sign a client until the check clears[7] but you can bet your ass I'm going to solicit them like crazy. I plan on calling off that Excel list I gave you all with the color highlights, so if there is anything I need to know on those, please share.

July 12, 2018 Email (ellipses in original); SMF ¶ 40. Mr. Nations responded that he would prefer that it be done "without a paper trail." July 12, 2018 Email.

At the end of July of 2018, Mr. Thurman was working on bringing both Mr. Nations and Ms. Hargroder over to PayrollHR, and he mentioned to them in an email the work that Mr. Rode had done to support their transition. July 26, 2018 Email (ECF No. 43-34). Mr. Thurman wrote:

- I will have by that time, in conjunction with Ron, some hard numbers. Numbers that dictate everything from my salary to both of yours, rent, lights, etc. Having those numbers will tell us how many units we need till we cover all this.
- Additionally, I, along with Ron, will front the funds to bring Ashley over in September. The only reason I put September is I think staggering your all's exit from Paychex keeps less heat off of us.

July 26, 2018 Email. Mr. Rode admits that he probably crunched the numbers about Ms. Hargroder and Mr. Nations for Mr. Thurman. SMF ¶ 52; Rode Dep. Vol. I 238:19–23; *see* Thurman Dep. Vol. II 435:12–20. In August of 2018, both Mr. Nations and Ms. Hargroder resigned from Advantage/Paychex. SMF ¶ 48. When Mr. Nations and Ms. Hargroder began working for PayrollHR that month, Mr. Rode wrote checks from PayrollHR's bank account to pay them. SMF ¶ 26.

Mr. Rode claims he was unaware of the efforts to misappropriate Advantage/Paychex information to solicit Advantage/Paychex clients. SMF ¶¶ 41–47.

---

[7] The last payment from Advantage/Paychex to Mr. Rode was made on July 20, 2018. SMF ¶ 12.

He also says he told Mr. Thurman to stop contacting Assigned Clients when he learned Mr. Thurman was doing that. SMF ¶ 67. There is some evidence that Mr. Rode was involved in work related to Advantage/Paychex clients for PayrollHR throughout the summer. For example, in July of 2018, he advised Mr. Thurman on how to handle time clocks for customers who PayrollHR would take away from Advantage/Paychex. SMF ¶ 51. Additionally, Mr. Thurman attempted to connect an Assigned Client and potential PayrollHR customer with Mr. Rode and followed up to see if the two had talked. Sept. 11, 2018 Email (ECF No. 43-39); Sept. 16, 2018 Email (ECF No. 43-40). Mr. Rode testified that he told any Assigned Client who contacted him to stay with Advantage/Paychex and never spoke disparagingly about the company. Rode Dep. Vol. I 97:18–98:22 (ECF No. 47-1).

By September, Mr. Rode and Mr. Thurman were not on speaking terms because of Mr. Thurman's continued solicitation of the Assigned Clients. Thurman Dep. Vol. II 497:21–25. But Mr. Rode's active involvement with PayrollHR continued until at least October 19, 2018, and his financial support continued through March of 2019. *See* Oct. 19, 2018 Email (ECF No. 43-38); SMF ¶ 25.

Advantage/Paychex lost roughly 300 Assigned Clients. SMF ¶ 60; Ex. WW (ECF No. 42-14). Mr. Rode does not admit that all of the clients listed in Exhibit WW were actively solicited by PayrollHR and denies soliciting any of those clients himself. SMF ¶ 60. Out of those clients, Advantage/Paychex's expert has identified 224 who became PayrollHR customers. SMF ¶ 63.

8

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party.' " *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact is 'material' if it 'has the potential of affecting the outcome of the case.' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). "The party moving for summary judgment bears the initial burden of showing" that no such dispute exists. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). Once it does so, the burden shifts to the nonmoving party to respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Id.* (internal quotation marks omitted).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions or empty conclusions.' " *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial." *Henry v. United Bank*, 686 F.3d 50, 54 (1st Cir. 2012) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

## DISCUSSION

The Plaintiffs allege that Mr. Rode's involvement with PayrollHR breached the NS Agreement and violated the Maine Uniform Trade Secrets Act and Defend Trade Secrets Act. Compl. 9–14 (ECF No. 1). They now move for summary judgment on Count I of the Complaint, the breach of contract claim against Mr. Rode in his individual capacity. Pls.' Mem. in Supp. of Mot. for Partial Summ. J. ("**Pls.' Mem.**") 1 n.1 (ECF No. 46-1).

The Plaintiffs argue that Defendant Rode breached three provisions of the NS Agreement: the "don't deter, hinder, or divert" clause; (2) the "no-service, no-solicit" clause and (3) the "no-poaching" clause. Pls.' Mem. 8–15.[8] In addition, the Plaintiffs assert that they are entitled to the liquidated damages agreed to in the NS Agreement because of Mr. Rode's breaches. Defendant Rode argues that he did not breach the NS Agreement and that there are material disputes of fact that cannot be resolved on a summary judgment motion. Def.'s Mem. in Opp'n to Pls.' Rule 56 Mot. for Partial

---

[8] The Plaintiffs also contend that the NS Agreement is enforceable as its restrictions are reasonable, not overbroad, and in furtherance of a legitimate business interest. Pl.'s Mem. 5–8. Maine generally considers non-competition covenants to be contrary to public policy. *Chapman & Drake v. Harrington,* 545 A.2d 645, 647 (Me. 1988). Such covenants "will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Id.* The Defendant does not address the Plaintiffs' enforceability argument. Regardless of the lack of opposition, I have considered the Plaintiffs' arguments, and I agree that the covenants in question are reasonable and are narrowly tailored to protect the Plaintiffs' legitimate business interest in retaining the Assigned Clients that they purchased from Mr. Rode. Accordingly, I agree that the NS Agreement is enforceable.

10

Summ. J. ("**Def.'s Opp'n**") 5–10 (ECF No. 48).[9] Below I address each of these issues in turn.

## I. Breach of Contract

To succeed on a breach of contract claim in Maine,[10] a plaintiff must show "(1) breach of a material contract term; (2) causation; and (3) damages." *Me. Woods Pellet Co. v. W. World Ins. Co.*, 401 F. Supp. 3d 194, 199–200 (D. Me. 2019) (quoting *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248). "A material breach of contract is a 'non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction [as] at an end.'" *Day v. Grey*, No. 2:17-cv-00286-JAW, 2019 WL 404971, at *8 (D. Me. Jan. 31, 2019) (quoting *Cellar Dwellers, Inc. v. D'Alessio*, 2010 ME 32, ¶ 16, 993 A.2d 1), *aff'd*, No. 19-1140, 2019 WL 11028983 (1st Cir. Oct. 28, 2019). In contract cases, courts typically do not consider the state of mind of the breaching party because "[c]ontract liability is strict liability." Restatement (Second) of Contracts, Ch. 11 Intro. Note (1981); *see CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1089 (2020); *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 655 (7th Cir. 2021); *see also Eldridge v. Gordon Bros.*

---

[9] The Defendant also argues that the use of the word "indirectly" in the NS Agreement is ambiguous, and that a trial is required to resolve that ambiguity. Def.'s Mem. in Opp'n to Pls.' Rule 56 Mot. for Partial Summ. J. ("**Def.'s Opp'n**") 6–8 (ECF No. 48). Because I conclude that the actions of Mr. Rode directly breached the "don't deter, hinder, or divert" clause, I do not consider whether any of his actions may also constitute indirect breaches of any NS Agreement provisions, and thus I need not determine whether the term "indirectly" is ambiguous.

[10] The parties agreed in the NS Agreement that Maine law applies. NS Agreement ¶ 11.

11

*Grp., LLC*, 863 F.3d 66, 88–89 (1st Cir. 2017); *DCCI, LLC v. Parker,* No. BCD-CV-13-65, 2015 Me. Bus. & Consumer LEXIS 51, at *24–25 (Sept. 29, 2015).

### A.  The "Don't Deter, Hinder, or Divert" Clause

The Plaintiffs argue that Mr. Rode breached the provision that prevented him from "tak[ing] any action or mak[ing] any statement, directly or indirectly, that could deter, hinder, or divert the ongoing business or patronage of Advantage or Paychex and the Assigned Clients." NS Agreement ¶ 6. The Defendant asserts that there is no evidence that Mr. Rode personally contacted, solicited, or diverted any of the Assigned Clients. Def.'s Opp'n 8–9. While that may be true, it does not answer whether Mr. Rode deterred or hindered the ongoing business or patronage of Advantage or Paychex and the Assigned Clients.

As the contract is written, if Mr. Rode's direct[11] actions and statements *could have* deterred, hindered, or diverted business, then the NS Agreement was breached, regardless of his motive or intent. The undisputed facts establish that Mr. Rode took direct actions that could have (and in fact did) deter, hinder, or divert the Assigned Clients' relationship with Advantage/Paychex. The term "hinder," as used in the NS Agreement, is commonly understood to mean "to hold back," *Hinder*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hinder (last accessed Dec. 15, 2022), or to "create difficulties for (someone or something), resulting

---

[11] The Defendants focus much of their opposition on whether Mr. Rode ever personally solicited clients and on whether the actions of Mr. Thurman, Mr. Nations, and Ms. Hargroder can properly be imputed to Mr. Rode. The Defendants also address at length whether the term "indirectly" as used in the NS Agreement introduces ambiguity that must be resolved by a jury. Because I find that Mr. Rode's direct actions breached the NS Agreement, I do not address these other arguments.

12

in delay or obstruction," *Hinder*, Oxford Dictionaries, Oxford Univ. Press, https://premium.oxforddictionaries.com/definition/american_english/hinder (last accessed Dec. 13, 2022). The parties do not dispute that Mr. Rode facilitated the loan of a significant amount of money, provided computers, office space, and furniture, and gave professional services and advice to PayrollHR. Nor do the parties dispute that PayrollHR operated a payroll service in the same geographical area that PSI formerly serviced. Mr. Rode's state of mind is irrelevant to whether his direct actions in supporting a competitor could have hindered Advantage/Paychex's relationship with Assigned Clients.[12] By providing professional and financial support directly to a company that was taking away Assigned Clients, Mr. Rode could (and did) hinder business between Advantage/Paychex and the Assigned Clients.[13]

The Defendant offers no argument that a breach of this clause would be immaterial. Indeed, the extent of Mr. Rode's support for PayrollHR and the numbers of lost clients would suggest that the breach was material. On the record before me, the Plaintiffs are entitled to summary judgment on their claim that Mr. Rode breached the "don't deter, hinder, or divert" clause.

---

[12] The "don't deter, hinder, and divert" clause in the NS Agreement does not contain a qualifier that a breaching party must act "knowingly or intentionally." *See CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1089–90 (2020) (noting that parties are free to contract for limitations to avoid strict liability for breach).

[13] The Defendant points out that the NS Agreement did not prohibit Mr. Rode from "participating in any manner in a competing payroll business." Def.'s Opp'n 9. That may be true, but he did agree not to take any action that could hinder the business relationship between Advantage/Paychex and the Assigned Clients.

13

### B. The Remaining Clauses

Having found that the Plaintiffs are entitled to summary judgment on their claim that Mr. Rode breached the "don't deter, hinder, divert" clause, I see no reason to determine whether there are undisputed material facts relating to his alleged breach of the "no-service, no-solicit" clause or the "no-poaching" clause. The Plaintiffs have already established that he breached the NS Agreement. The only question left is whether the Plaintiffs are entitled to judgment as a matter of law on their request for liquidated damages under the NS Agreement.

## II. Liquidated Damages

The Plaintiffs take the position that they are entitled to the liquidated damages agreed upon in the NS Agreement because of Mr. Rode's material breach. Pls.' Mem. 16. The NS Agreement provides that, in the event of a breach, Mr. Rode would be liable for "five times the [Trailing Twelve Months] revenue that was used to calculate the Asset Purchase Price Advantage paid for any Assigned Client that ceases its patronage of [Advantage/Paychex] as a result of [Mr. Rode]'s breach, . . . without any need to establish actual damage or harm." NS Agreement ¶ 7. According to the Plaintiffs, this amounts to $3,475,668.35. Pls.' Mem. 16. Defendant Rode does not deny that the NS Agreement allows for liquidated damages under certain circumstances, but he does not admit those circumstances have been met or that the Plaintiffs' calculations are accurate. SMF ¶ 63.

Liquidated damages clauses must meet a two-part test to be enforceable. *Sisters of Charity Health Sys. v. Farrago*, 2011 ME 62, ¶ 13, 21 A.3d 110. The damages caused by the breach must be "very difficult to estimate accurately" and the

14

amount fixed must reasonably forecast "the amount necessary to compensate justly one party for the loss occasioned by the other's breach." *Infinity Real Est. LLC v. Deutsche Bank Nat'l Tr. Co.*, 2:18-cv-00038-LEW, 2019 WL 1903390, at *5 (D. Me. Apr. 29, 2019) (quoting *Bernath v. Potato Servs. of Mich.*, 300 F. Supp. 2d 175, 183 (D. Me. 2004)). Maine courts enforce good-faith attempts to fix the amount of damages. *Raisin Mem'l Tr. v. Casey*, 2008 ME 63, ¶ 16, 945 A.2d 1211. "[T]he 'test is one of reasonableness: if such provisions reflect the anticipated or actual loss caused by the default and are not usurious or excessive so as to constitute a penalty, they will be enforced.' " *Id.* (quoting *St. Hilaire & Assocs., Inc. v. Harbor Corp.,* 607 A.2d 905, 907 (Me. 1992)). "The enforceability of a liquidated damages provision is a question of law." *Pacheco v. Scoblionko*, 532 A.2d 1036, 1038 (Me. 1987). But a determination of whether the two-part test is met is based on facts." *Raisin Mem'l Tr.*, 2008 ME 63 ¶ 17; 945 A.2d 1211 (internal citation omitted). The party seeking to enforce a liquidated damages clause bears the burden of proving its validity. *Pacheco*, 532 A.2d at 1039.

The Plaintiffs argue that the first requirement is met, and the Defendants do not argue otherwise. According to the Plaintiffs, damages are very difficult to estimate accurately because a payroll processing company's business depends on its relationship with clients. Pls.' Mot. 16. In general, damages for breach of non-compete provisions are difficult to quantify in client-dependent industries. *See Sisters of Charity*, 2011 Me. 62, ¶ 14, 21 A.3d 110; *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). In *Sisters of Charity*, the Maine Law Court looked at a liquidated damages provision

15

in a doctor's employment contract and found that it was enforceable. 2011 Me. 62, ¶¶ 14–15, 21 A.3d 110. It noted that "[a]t the time that the parties executed their employment contracts, it was not possible to determine how many patients would leave with their doctor or how much revenue those patients would have generated." *Id.* ¶ 14. Here, too, it is likely that it was very difficult for the parties to determine how many Assigned Clients would leave in the event of a breach.

As to the second requirement, the Plaintiffs argue that the forecast was reasonable because their expert calculated that 224 Assigned Clients left them for PayrollHR and that the Trailing Twelve Months revenue for those Assigned Clients was $696,133.67. Multiplying this number by five gives the $3.475 million dollar figure that the Plaintiffs seek. Pls.' Mem. 16.

Based on the facts before me, however, I am not convinced that this is a reasonable forecast as a matter of law. I note that the Defendant has only challenged the liquidated damages in his qualified response to one of the Plaintiffs' statements of fact and offers nothing to demonstrate that the Plaintiffs' expert calculations are inaccurate or to show how the Plaintiffs have not met the two-part test for liquidated damages. *See* SMF ¶ 63. But even if I accept all the Plaintiffs' evidence as true, I am unable to make the determination that the damages are reasonable.

The Plaintiffs do not explain how they arrived at the multiplier of five when the duration of the agreement is only four years. *See AMG Nat'l Tr. Bank v. Ries*, Nos. 06-CV-4337, 09-CV-3061, 2011 WL 6840586, at *3–4 (E.D. Pa. Dec. 29, 2011) ("[W]hile employers often base damages for non-compete violations on a multiple of

16

the previous year's fees generated from the wrongfully-solicited client, these fees are rarely multiplied by a number greater than the number of years during which the non-competition agreement is in effect." (internal quotation marks omitted)) And there has been no evidence of how long it would take to attract replacement clients. *See Sisters of Charity*, 2011 ME 62, ¶ 14, 21 A.3d 11 (holding liquidated damages clause in a non-compete contract signed by a doctor enforceable where there was evidence that it takes 2–3 years for a replacement doctor to generate the same revenue as an established doctor). While it may be that the liquidated damages clause does provide a reasonable forecast of the Plaintiffs' loss, I cannot say that as a matter of law on the record before me. *See Raisin Mem'l Tr.*, 2008 ME 63, ¶¶ 17–18, 945 A.2d 1211.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Plaintiffs' Motion for Partial Summary Judgment (ECF No. 46). The Motion is **GRANTED** as to the Plaintiffs' entitlement to judgment on Count I of the Complaint, but, because the enforceability of the liquidated damages contract provision is not resolved on the current record, the Motion is **DENIED** without prejudice as to the Plaintiffs' entitlement to liquidated damages.

SO ORDERED.

/s/ Nancy Torresen<br>United States District Judge

Dated this 16th day of December, 2022